**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HELEN PHILPOT, | ) | CASE NO. 1:17CV447 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Helen Philpot ("Plaintiff" or "Philpot"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

application for Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set

forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

In September 2012, Philpot filed an application for SSI, alleging a disability onset date of December 26, 2009 and claiming she was disabled due to asthma and osteoarthritis.  (Transcript ("Tr.") 107, 223, 245.)  The applications were denied initially and upon reconsideration, and Philpot requested a hearing before an administrative law judge ("ALJ").  (Tr. 126-128, 136-137, 141.)

On May 20, 2014, an ALJ held a hearing, during which Philpot, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 23-49, 107.)  On August 28, 2014, the ALJ issued a written decision finding Philpot was not disabled.  (Tr. 107-117.)  On August 3, 2015, the Appeals Council issued an Order remanding the case to the ALJ for a new decision.  (Tr. 120-121.) On remand, the ALJ was ordered to do the following:

- Obtain additional evidence concerning the claimant's physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding  consultative examinations and existing medical evidence (20 CFR 416.912- 913).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 416.945 and Social Security Ruling 96-8p).

- Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p). (Tr. 121.)

On December 2, 2015, the ALJ held a hearing during which Philpot, represented by counsel, and a different vocational expert ("VE") testified. (Tr. 10, 50-76.) On January 5, 2016, the ALJ issued a written decision finding Philpot was not disabled. (Tr. 10-22.) The ALJ's decision became final on January 10, 2017, when the Appeals Council declined further review. (Tr. 1-4.)

On March 6, 2017, Philpot filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 15.) Philpot asserts the following assignments of error:

(1)     The ALJ's failure to provide Plaintiff with a supplemental hearing so that she could confront and cross-examine [VE] Mr. Nimberger was prejudicial and/or deprived her of a full and fair hearing.

(2)     The ALJ's RFC is not based on substantial evidence and/or is contrary to law.

(Doc. No. 14 at 4.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Philpot was born in June 1977 and was thirty-five (35) years-old on the date the application was filed and thirty-eight (38) years old at the time of the December 2015 administrative hearing, making her a "younger" person under social security regulations. (Tr. 15.) *See* 20 C.F.R. § 416.963(c). She has a high school education and is able to communicate in English. (Tr. 15.) She has no past relevant work. (*Id*.)

### B.     Relevant Medical Evidence [2]

---

[2]     The Court notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The Court further notes that the Plaintiff has cited generally to large swaths of evidence in her Brief, totaling over 500 pages. (Doc. No. 14 at 4.) This does not comply with the Court's Order, which specifically provides that the brief "shall cite, by exact

The bulk of Philpot's treatment records consist of emergency room visits relating to her asthma. In May 2010, Philpot visited the emergency room twice, once for nasal congestion and then again for an asthma exacerbation. (Tr. 380, 373.) The emergency room physicians provided her with medications and discharged her the same day. (Tr. 375, 376.) Philpot visited the emergency room again on April 24, 2012 for an asthma attack. (Tr. 583.) She was prescribed a short course of prednisone. (Tr. 583-585.)

In September 2012, Philpot went to the emergency room two times for asthma attacks. Each time she received an albuterol inhaler and short 5-day course of steroids. (Tr. 541, 545.) In October 2012, she visited the emergency room three times for asthma exacerbations. (Tr. 684, 692, 698.) She was provided with steroids during one visit, and albuterol inhalers during the other two. (*Id.*)

Philpot returned to the emergency room on November 17, 2012 for vomiting and again on November 26, 2012 for a sore throat. (Tr. 702, 721.) On December 17, 2012, a CT scan of her chest revealed mild diffuse bronchial wall thickening, which was consistent with reactive airway disease. (Tr. 707.) There were no acute findings. (*Id.*)

On January 1, 2013, Philpot visited the emergency room for an asthma attack. (Tr. 731.) She reported shortness of breath, mild wheezing, and a cough. (Tr. 734.) She indicated she had run out of her albuterol. (*Id.*) On examination, she was not in respiratory distress, but she did have some decreased breath sounds and wheezing. (Tr. 735.) She received albuterol and a course of steroids. (Tr. 731). Philpot returned a few weeks later, on January 29, 2013. (Tr. 741.) She had again run out of her asthma medications, and was experiencing shortness of breath. (*Id.*) She

and specific transcript page number, the pages relating" to the facts at issue. (Doc. No. 5 at 3.) Thus, the Court discusses only that evidence which has been cited by the parties with specificity, as required by this Court's Order.

relayed she had not been taking her Advair, but was planning on filling her prescription that day. (*Id.*)

On February 10, 2013, Philpot presented to the emergency room, reporting shortness of breath. (Tr. 727.) She again indicated she had run out of her medications. (*Id.*) On examination, she was not wheezing or in respiratory distress. (Tr. 728.) She appeared comfortable, and was discharged home with a prescription for albuterol. (*Id.*)

Philpot again ran out of her inhaler, and subsequently presented to the emergency room for an asthma exacerbation, on April 29, 2013. (Tr. 770.) The emergency room physician noted Philpot was "well known" for her recurrent asthma exacerbations and had "trouble following up and keeping appointments" with her primary care doctor. (Tr. 803.) Philpot was not wheezing on examination, and the doctor urged her to see a primary care doctor and get back on her medications. (*Id.*)

Philpot went to the emergency room for a bladder infection on July 16, 2013, and again on September 18, 2013. (Tr. 816, 822.) During her September 2013 visit, she also reported she had twisted her right knee while picking up her niece. (Tr. 823.) She indicated she was still having pain, though her right knee was normal on examination, with no joint effusion. (*Id.*) The hospital doctor diagnosed her with a knee strain. (Tr. 825.)

Philpot had another emergency room visit for a bladder infection on January 7, 2014. (Tr. 790.) She visited the emergency room on February 7, 2014 for a sore throat. (Tr. 793.)

On April 9, 2013, Philpot visited South Pointe Hospital for a physical capacity evaluation. (Tr. 774.) Lidiya Kanarsky, an occupational therapist, was the evaluator. (*Id.*) During the examination, Philpot presented with a standard cane for ambulation, and reported left knee arthritis and asthma. (*Id.*) She occasionally grimaced in pain during the evaluation. (*Id.*)

Ms. Kanarsky conducted a detailed physical examination of Philpot. Philpot had decreased grip strength on examination; good strength throughout the upper extremities; good strength in her right leg, left hip, and ankle; and fair strength in her left knee. (Tr. 775.) Philpot reported a sitting tolerance of 15-20 minutes, and had an observed sitting tolerance of 30 minutes. (Tr. 776.) She reported a standing tolerance of 5 minutes, and had an observed standing tolerance of 11 minutes. (*Id*.) Ms. Kanarsky noted that while Philpot reported left knee pain, she was using her cane in the right hand. (*Id*.) She questioned Philpot as to why she was using the cane in this manner, and Philpot implied her doctor had instructed her to use it this way. (*Id*.)

Following this examination, Ms. Kanarsky made the following recommendations in her report:

- The patient's maximum lifting and carrying weight is approximately 17 pounds using just her left hand. She would be able to lift and carry 17 pounds occasionally with frequent lifting and/or carrying of objects weighing up to 8.5 pounds. The patient's maximum status lift using both arms is 39 pounds occasionally and 20 pounds frequently.

- The patient would be a good candidate for a part-time sedentary to light job task with lifting capabilities as described above.

- The patient would benefit from further therapy treatments, specifically physical therapy to address her left knee pain and gait training with proper use of an assistive device. The patient may also benefit from physical therapy aquatics for her left knee pain relief.

- The patient should avoid repetitive tasks of shifting, etc., and alternate any repetitive tasks with non-repetitive.

- The patient has a sitting tolerance limited to 15-20 minutes reported and 30 minutes observed, and standing tolerance limited to 5 minutes reported and 11 minutes observed, which is functional for part-time employment allowing for frequent change in working position. (Tr. 774.)

Philpot continued to visit the emergency room on a regular basis. On March 18, 2014, she

visited the emergency room, indicating she had fallen and twisted her left foot a few weeks ago and was still in pain. (Tr. 872.) On examination, she did have some tenderness, but her x-ray was negative for fracture. (Tr. 874.) The doctor told her to take Motrin, and follow up with a primary care doctor or orthopedist as needed. (*Id*.)

On May 5, 2014, Philpot visited the emergency room, reporting shortness of breath. (Tr. 900.) She indicated she had recently run out of her nebulizer and asthma medications. (Tr. 901.) She had faint wheezing on examination. (Tr. 902.)

Philpot underwent a consultative examination, with Eulogio Sioson, M.D., at the request of the Social Security Administration, on June 24, 2014. (Tr. 883.) During the examination, Philpot reported knee pain since 2009. (*Id*.) She relayed her treatment course was currently over the counter pain medications. (*Id*.) She also reported asthma since 2009, and indicated she visited the emergency room an average of seven times a year for such. (*Id*.) She indicated she was using her albuterol inhaler four times a week. (*Id.*)

During the examination, Philpot was walking with a slight limp, with no assistive device. (*Id*.) She declined to do any heel/toe walking or squatting, citing knee pain. (*Id*.) She was able to get up and down from the examination table. (*Id*.) Her lungs had a somewhat diminished breath sounds, but no crackles, rhonchi, or wheezing. (*Id*.)

On examination, Phipot's knee had a clicking sound with range of motion, along with some mild puffiness. (Tr. 884.) Dr. Sioson indicated it was "difficult to evaluate for instability due to pain." (*Id*.) Otherwise, she had no heat, redness, swelling, subluxation, or gross deformity in the joints. (*Id*.) She had full strength in her upper extremities, and overall full strength in her lower extremities, beyond slightly decreased strength in her left knee. (Tr. 896.) She had normal grasp,

manipulation, pinch, and fine motor coordination. (*Id.*) She had no muscle spasm or atrophy. (*Id.*) Philpot had full range of motion in her cervical spine, wrists, elbows, and hands. (Tr. 897.) She did have decreased range of motion in her shoulders, hips, knees, and lumbar spine. (Tr. 897, 898.)

Dr. Sioson administered a pulmonary function test, which revealed a moderate obstructive ventilator impairment, with significant response after bronchodilator. (Tr. 893.) Philpot's $FVC^3$ value prior to a bronchodilator was 2.94, and after was 3.03. (*Id.*) Her $FEV_1$ was 1.86 prior to the bronchodilator, and 2.52 afterwards[4]. (*Id.*)

Dr. Sioson opined "if one considers limitation of range of motion from pain and above findings, work-related activities would be limited to light or sedentary work." (Tr. 884.) He also provided a more specific opinion by filling out a form. (Tr. 885-889.) He opined:

- Philpot could frequently lift/carry up to 10 pounds, and occasionally lift up to 20. (Tr. 885.)

- She could sit for one hour at a time, and 4 hours total in an 8-hour workday. (Tr. 886.)

- She could stand for 15 minutes and walk for 15 minutes at a time, and for 1 hour total in a workday. She did not need a cane to ambulate. (*Id.*)

- She had no limits with her hands, including reaching, handling, and fingering. (Tr. 887.)

- She could occasionally climb ladders, scaffolds, ramps, and stairs. She could occasionally stoop and balance, but never kneel, crouch, or crawl. (Tr. 888.)

---

[3]      Per the Listings, FVC means "forced vital capacity." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §3.00(C).

[4]      Per the Listings, $FEV_1$ means forced expiratory volume in the first second of a forced expiratory maneuver. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(C).

- She could never work at unprotected heights, or in humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat. She could occasionally work near moving mechanical parts or operate a motor vehicle. (Tr. 889.)

On August 12, 2014, Philpot visited the emergency room, reporting pain in her right foot and a cough. (Tr. 908.) She denied any shortness of breath. (*Id*.) On examination, her foot appeared normal. (Tr. 909.) Her x-ray revealed hallux valgus and osteoarthritis in her right foot. (Tr. 911.) She was not in any respiratory distress or wheezing. (Tr. 913.) The emergency room doctors diagnosed her with a cough, right foot sprain, and asthma exacerbation. (Tr. 909.)

Philpot visited the emergency room again on September 20, 2014, reporting nausea and vomiting. (Tr. 919.) On April 23, 2015, she had an emergency room visit for an upper respiratory infection and sore throat. (Tr. 928.) She did not have any shortness of breath. (*Id*.) She again visited the emergency room for nausea and vomiting on June 23, 2015. (Tr. 935.)

On July 19, 2015, Philpot visited the emergency room reporting shortness of breath. (Tr. 943.) She indicated she had never been intubated or hospitalized for her asthma, and her last exacerbation had been about seven months prior. (*Id*.) Philpot reported the day before she had been helping her brother move, and was now having shortness of breath. (*Id*.) She admitted she had been out of her albuterol inhaler for several months, and had been using her nebulizer machine. (*Id*.)

On examination, Philpot had diminished breath sounds and diffuse wheezing on examination. (Tr. 944.) The emergency room doctors felt she did not need a chest x-ray, but they did provide her with an aerosol treatment and a course of steroids. (*Id*.) They encouraged her to get her inhaler prescription refilled. (*Id*.)

Philpot returned to the emergency room on August 26, 2015, reporting she wanted to have her albuterol prescription filled. (Tr. 951.) She was speaking clearly, with no shortness of breath

or distress. (*Id*.) She again relayed she had never been hospitalized or intubated for her condition. (Tr. 952.) She reported she used an inhaler and nebulizer as needed, but had not needed it in the past week. (*Id*.) Her chest x-ray was negative for any acute pathology. (Tr. 953.) The hospital doctors administered a breathing treatment, and she felt better. (*Id*.) The doctors noted she was "overall a very well appearing" patient. (*Id*.)

On November 6, 2015, Philpot presented to the emergency room with shortness of breath. (Tr. 961.) She reported she was out of her medications and needed refills. (*Id*.) She received an aerosol treatment, and reported improvement. (*Id*.) The hospital doctors discharged her with prescriptions for an inhaler and nebulizer solution. (*Id*.)

**C.     State Agency Reports**

On November 16, 2012, state agency physician Maria Congbalay, M.D., reviewed Philpot's records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 90 - 93.) Dr. Congbalay determined Philpot could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. (Tr. 90.) She further found Philpot should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 91.)

On April 20, 2013, state agency physician Leanne Bertani, M.D., reviewed Philpot's records and completed a Physical RFC assessment. (Tr. 99- 101.) Dr. Bertani adopted the findings of Dr. Congbalay. (Tr. 100, 101.)

**D.     Hearing Testimony**

During the May 20, 2014 hearing, Philpot testified to the following:

- She graduated from high school and completed some college coursework. (Tr. 27.) She was in special education while in school, and did not complete her college degree. (Tr. 28.)

- She last worked 15 years ago as a cashier. She has tried to apply to other jobs since then, but has been unsuccessful. (Tr. 29.)

- She is disabled due to asthma and osteoarthritis in her left knee. (*Id.*) She can lift 17 pounds with both hands. (Tr. 30.) She can walk 5-10 minutes at the most, and then her knee will give way. (*Id.*)

- She has fallen, and she uses a cane to ambulate. (*Id.*) She did not bring it to the hearing because she forgot. (Tr. 31.)

- She also has problems sitting for extended periods, because her knee will begin to hurt. (*Id.*) She takes Ibuprofen and Tylenol for her pain. (*Id.*) She has seen a doctor for her knee, and the doctor told her it was arthritis. (Tr. 32.) Her knee pain is sporadic. (Tr. 35.)

- She has had asthma since 2009. (Tr. 33.) She takes albuterol and a "machine" at home for her symptoms. (*Id.*) She is now compliant with her medications, but still has had 4 exacerbations since becoming compliant. (*Id.*) She visits the emergency room when she has these exacerbations, and has never had to stay overnight in the hospital. (Tr. 34.) She receives breathing treatments and steroids when she visits the emergency room. (*Id.*)

Vocational expert ("VE"), Hermona Robinson, testified at the first hearing. (Tr. 37.) The ALJ concluded Philpot had no past relevant work. (Tr. 38.) The ALJ then posed the following hypothetical question:

> I'd like you to assume a hypothetical individual who can lift and carry 50 pounds occasionally and 25 pounds frequently, could stand or walk six hours out of eight, can sit for six hours out of eight and must avoid concentrated exposure to extreme cold, extreme heat, humidity and fumes, odors, dusts, gases and poor ventilation. (*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as 1) packager (D.O.T. #920.587-018),of which there were 30,000 positions in the state of Ohio and 100,000 in the national economy; 2) laborer, stores (D.O.T. #922.687-058),

of which there are 50,000 positions in the state of Ohio and 200,000 in the national economy; and 3) stubber (D.O.T. #222.687-034), of which there are 20,000 positions in the state of Ohio and 55,000 in then national economy.  (Tr. 38, 39.).  All of these positions were from the medium exertional level, and unskilled with an SVP of 2.  (*Id*.)

The ALJ posed another hypothetical question, asking the VE to consider the same individual as the above hypothetical, except that individual would be limited to sedentary work.  (Tr. 39.)  The VE then provided three sedentary jobs, all of which were unskilled with an SVP of 2.  (*Id*.)  These jobs were a call out operator (D.O.T. #237.367-014), an order clerk (D.O.T. #209.567-014), and a table worker (D.O.T. #739.687-182).  (Tr. 39, 40.)

Philpot's attorney then had the following exchange with the VE:

*****

Atty: Let's use the Judge's second hypothetical question, and lets assume that this hypothetical claimant, sitting tolerance was limited to 15 to 20 minutes at one time, and that standing tolerance would be 5 minutes reported and 11 minutes observed.  So let's say 11 minutes, the standing tolerance.  Would that –

ALJ: How much –

Atty: change the response to your hypothetical question?

ALJ: How much, total, per day?

Atty: Oh, I'm sorry.

ALJ: Is it at the sedentary level, still?

Atty: Yeah, still at the sedentary level.  I'm sorry.  Thank you, Judge.

ALJ: Yeah.

VE: And, I just wanted some clarification.

Atty: Certainly.

VE: You said – you said five minutes, and then you said 11 minutes.

Atty: Yeah, I struck that.

VE: You just changed it to 11, you mean?

Atty: Changed, yeah, 11 minutes, the standing –

VE: standing?

Atty: – tolerance at one time was 11 minutes.

VE: Okay.

Atty: And that the sitting tolerance was limited to 5 to 20 minutes, and I might as well just put the other factor in there, too. The – it's just sedentary-type work, as far as lifting's concerned, but I will give you the exact parameter. She would be able to – the hypothetical claimant would be able to carry 17 pounds occasionally, frequently lift and/or carry objects weighing – weighing up to 8.5 pounds. With those two additional requirements, would this hypothetical claimant be able to perform any of the jobs you identified in response to hypothetical question #2?

VE: I do believe that if an individual could only sit or stand for those amounts of time, even though it is the course of the day, that those time periods are so small that it is disruptive to any type of productive work that would take place. So that, in combination with the lifting and carrying which, actually, the occasional goes up to 17 pounds. So, which is –

Atty: Right.

VE: – you know, way beyond the sedentary, and the other is at frequent. So I don't know that the – that so much would have impacts. But, I'm basing – my decision is really based upon the sitting and standing tolerance, that I do believe those would be work preclusive.

Atty: I need to make one small change, if I could, in regards to the sitting tolerance.

VE: um-hum

Atty: Instead of 15 to 20 minutes, let's put down 30 minutes at one time. Would that make any difference in terms of the answer that you just gave us?

VE: I still believe that even that 30 minutes it's the same, that it's disruptive.

\*\*\*\*\*

(Tr. 41-43.)

At the end of the hearing, the ALJ informed Philpot and her attorney he was going to send interrogatories to a vocational expert following the hearing, because the numbers VE Robinson provided were "ridiculous." (Tr. 45.) He also agreed to send Philpot out for a consultative examination for a physical exam with pulmonary testing. (Tr. 46.)

The ALJ subsequently submitted interrogatories to VE Thomas Nimberger. (Tr. 291.) After receiving the responses, Philpot requested the opportunity to propose a follow-up interrogatory to Mr. Nimberger. (Tr. 298.) The ALJ did not respond to Philpot's request and issued an unfavorable decision. (Tr. 107 - 117).

At the December 2, 2015 hearing, conducted after remand from the Appeals Council, Philpot testified to the following:

- She cannot work due to her asthma. (Tr. 56.) She gets tired and short of breath with household chores, walking, and standing. (*Id.*) She can lift about seven pounds. (Tr. 57.) She can lift a gallon of milk, but not a sack of potatoes. (*Id.*)

- Cooking can exacerbate her asthma. (*Id.*) She will cook sometimes. (*Id.*)

- She has five "bad days" a week. (Tr. 58.) She will use her inhaler or go to the hospital for a breathing treatment on these days. (*Id.*)

- Her doctors have told her she has osteoarthritis. (Tr. 59.) She cannot walk or sit for too long due to her knee. (*Id.*) She can sit for 15 minutes, and then will need to stand up. (*Id.*) She can walk for 20 minutes. (*Id.*) She can stand for a couple of minutes. (Tr. 60.) She denied she was receiving any treatment for her knee from her doctors. (*Id.*) She takes ibuprofen daily. (Tr. 61.)

14

- She had examinations in April 2013 and June 2014. (Tr. 62.) She gave her best effort during both examinations. (*Id.*)

A different VE, Deborah Lee, testified at the second hearing. (Tr. 63.) The ALJ again concluded Philpot had no past relevant work. (Tr. 64.) The ALJ then posed the following hypothetical question:

> I'd like you to assume a hypothetical individual who's limited to light work and must avoid concentrated exposure to extreme cold, extreme heat, humidity, and to fumes, odors, dusts, gases, and poor ventilation. (*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as a mail clerk in a non-postal setting (D.O.T. #209.687-026); a cashier II (D.O.T. #211.462-010); and a sales attendant (D.O.T. #299.677-018). (*Id.*) All of these positions were from the light exertional level, and unskilled with an SVP of 2. (*Id.*)

The ALJ then asked the VE to consider the same individual, but limited to sedentary work. (Tr. 65.) The VE responded this hypothetical individual would be able to perform representative jobs in the economy, such as an inspector (D.O.T. #726.684-110); a cashier II (D.O.T. #211.462-010); and call out operator (D.O.T. #237.367-014). (*Id.*)

Philpot's attorney then posed the following hypothetical:

> The first hypothetical is that the person would be limited to sedentary work with an SVP of 1 or 2 with a lifting and carrying capacity of 17 pounds using just the left hand and that would be occasionally and eight and a half pounds frequently, that sitting would be limited to 30 minutes at one time and standing limited to 11 minutes at one time, and that the hypothetical person must avoid repetitive tasks of shifting, et cetera.

(Tr. 67.)

The VE asked for clarification as to what "shifting" meant. (*Id.*) Counsel then changed the hypothetical, removing "shifting" and adding a sit/stand option at will, and restricting her from all

15

exposure to dusts, odors, fumes, and pulmonary irritants.  (*Id*.)  He also removed the SVP restrictions, and instead added a limitation of simple, routine tasks.  (Tr. 68, 69.)  The VE testified that "the ability to sit for 30 minutes and stand for a few minutes, generally that ability is available in sedentary work because the chair is already there so I would not change the three jobs that I gave you for sedentary work."  (Tr. 71.)

Philpot's counsel then reminded the ALJ that the VE who answered the interrogatories submitted after the May 20, 2014 hearing (i.e. Mr. Nimberger) found no jobs available in response one of the hypotheticals.  (Tr. 72.)  Somewhat confusingly, counsel stated he needed to "deal with this issue of repetitive task shifting," and focused on the occupational therapist's finding Philpot should avoid "repetitive tasks of shifting et cetera and alternative any repetitive tasks with non-repetitive."  (Tr. 72-73.)  The ALJ and counsel expressed confusion over the meaning of this restriction.  (*Id*.)  At the ALJ's suggestion, counsel then added to his hypothetical that Philpot could perform goal-oriented work, but could not work at a production rate pace.  (Tr. 73, 74.)  The VE removed the inspection work, but testified that the other two jobs would remain.  (Tr. 74.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity"

at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since September 28, 2012, the application date. (20 CFR 416.971 *et seq.*)

2.    The claimant has the following severe impairment: asthma. (20 CFR 416.920(c).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926(c)).

4.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she must avoid concentrated exposure to extreme cold, extreme heat, humidity, dust, fumes, gases, odors, and poor ventilation.

5.       The claimant has no past relevant work (20 CFR 416.965).

6.       The claimant was born on June ** 1977 and was 35 years old, which is defined as a younger individual age 18-49, the date the application was filed. (20 CFR 416.963).

7.       The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.       Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.       Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.      The claimant has not been under a disability, as defined in the Social Security Act, since September 28, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-17.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A.      First Assignment of Error: Supplemental Hearing/Due Process**

The procedural history of Philpot's claim is complicated, and an in-depth analysis of her first assignment of error requires an overview of the facts.  Philpot had her first hearing for this claim on May 20, 2014.  (Tr. 23.)  Following this hearing, the ALJ submitted interrogatories to VE Thomas Nimberger.  (Tr. 291.)  Relevant to here, one of the interrogatories provided the following hypothetical:

> Assume the hypothetical individual . . . is limited to sedentary work, svp 1 or 2, with lifting and carrying up to 17 pounds using her left arm, lifting and carrying 17 pounds occasionally and 8 ½ pounds frequently, sitting limited to 30 minutes at one time and standing limited to 11 minutes at one time, must avoid repetitive tasks of shifting, etc and alternate any repetitive tasks with non repetitive tasks, has a sit/stand option at will, and must avoid all exposure to dusts, odors, fumes, and pulmonary irritants.

(Tr. 293.)

Mr. Nimberger responded this hypothetical individual could not perform any jobs that exist in the national economy. (Tr. 295.) Philpot then requested the ALJ either issue a favorable decision, or issue another follow-up interrogatory to Mr. Nimberger. (Tr. 298.) The ALJ did not respond to this request, and issued an unfavorable decision on August 28, 2014. (Tr. 104.)

Philpot sought review of this decision, and on August 3, 2015, the Appeals Council vacated the decision and remanded the claim back to the ALJ for a new decision. (Tr. 121.) The Appeals Council found the ALJ violated *HALLEX I-2-5-58B*[5] by failing to respond to Philpot's request. (Tr. 120.) Upon remand, Philpot had a second hearing on December 2, 2015, during which the ALJ took vocational expert testimony from Ms. Lee. (Tr. 63.) On December 7, 2015, Philpot requested a supplemental hearing. (Tr. 300.) She based her request on the fact Mr. Nimberger's interrogatory responses differed from Ms. Lee's testimony. (*Id*.) Philpot indicated the purpose of the requested supplemental hearing was to develop what the limitation "should avoid repetitive tasks of shifting, etc. and alternate any repetitive task with nonrepetitive tasks" meant. (*Id*.) Philpot specifically requested Mr. Nimberger attend the hearing. (*Id*.) The ALJ did not respond to this request, and on January 5, 2016, issued a new unfavorable decision. (Tr. 10-17.) The Appeals Council denied her request for review. (Tr. 1.)

In her first assignment of error, Philpot argues the ALJ failed to follow the provisions of *HALLEX* 1-2-5-58 and violated her due process rights when she failed to conduct a supplemental

---

[5]     "*HALLEX*" is an acronym for the Hearings, Appeals and Litigation Law Manual, a publication created by the Social Security Administration. *HALLEX* is a procedural manual which sets forth the safeguards and procedures for the Administrative Law Judge hearings. *Robinson v. Barnhart,* 124 Fed. App'x 405, 410 (6th Cir. 2005).

hearing.  Specifically, Philpot argues she was "prejudiced by the denial of a supplemental hearing to question [VE] Nimberger on the material factual dispute" between his answer to the interrogatory set forth above (which she claims would have resulted in a disability determination); and the subsequent testimony of VE Lee during the December 2015 hearing. (Doc. No. 14 at 10.)  She maintains the ALJ "abandoned his role as an impartial decision maker (by calling on Ms. Lee to testify after Plaintiff had been dealt a winning hand)."  (*Id.*)  Lastly, Philpot argues the ALJ failed to fully develop the record by denying her "the opportunity to submit an additional interrogatory to Mr. Nimberger" and/or not "calling upon Mr. Nimberger to testify at a supplemental hearing."  (*Id.*)

The Commissioner acknowledges the ALJ initially erred in failing to provide Philpot with an opportunity to question Mr. Nimberger.  (Doc. No. 15 at 10.)  However, she argues the Appeals Council "remedied this error by remanding Plaintiff's claim to the ALJ for a new decision."  (*Id.*)  The Commissioner notes the Appeals Council remanded the first ALJ decision for "failure to address Plaintiff's written request to pose additional interrogatories to Mr. Nimberger" and ordered the ALJ to "obtain evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base."  (Doc. No. 15 at 9, 10.)  The Commissioner argues the ALJ complied with this order by holding a new hearing, and obtaining additional vocational expert testimony.  (*Id.*)  She further argues the ALJ properly developed testimony from the vocational expert during the December 2015 hearing, as required by the Appeals Council, and asserts Philpot had "ample opportunity to question this expert."  (*Id.* at 11.)  Thus, the Commissioner argues Philpot's first assignment of error is without merit and should be denied.

The Sixth Circuit has acknowledged that due process principles apply to Social Security proceedings. *Robinson v. Barnhart,* 124 Fed. App'x 405, 410 (6th Cir. 2005). Due process requires a social security hearing be "full and fair." *Laddy v. Astrue,* 2012 WL 776551 at *11 (N.D. Ohio Feb. 2, 2012). A claimant must have the opportunity to present all of the evidence, as well as confront the evidence against her. *Id.* (*citing Flatfor v. Chater,* 93 F.3d 1296, 1306 (6th Cir. 1996)). While there is not an absolute right to cross-examination for the development of a complete record, it should be available "where reasonably necessary to the full development of the case." *Flatfor,* 93 F.3d at 1307.

For the following reasons, the Court finds the ALJ did not violate Philpot's due process rights by failing to follow *HALLEX* provisions relating to supplemental hearings.[6] As noted above, the ALJ took vocational expert testimony at the hearing from Ms. Lee. (Tr. 63.) Philpot had the opportunity to question Ms. Lee fully during this hearing and, in fact did so. (Tr. 67-74.)

---

[6] Although not discussed in detail by either party, the Court notes the *HALLEX* addresses both vocational expert testimony and supplemental hearings. With respect to vocational expert testimony, *HALLEX I-2-6-74* provides the "claimant and the representative have the right to question the VE fully on any pertinent matter within the VE's area of expertise." *HALLEX I-2-6-80* provides the framework in which a supplemental hearing is necessary. This section notes that a supplemental hearing is appropriate when: 1) certain testimony or a document takes the claimant by surprise, "is adverse to the claimant's interest, and presents evidence that the claimant could not reasonably have anticipated and to which the claimant is not prepared to respond;" 2) the ALJ believes additional testimony regarding the new issue is appropriate; 3) the ALJ, during the hearing, discovers that the testimony of additional person, who is not present, is needed; 4) the claimant or the ALJ wishes to present evidence, but cannot present it "without diminishing its probative value because of the absence of opportunity to for detailed examination or cross examination of the witness;" 5) an order or remand directs the ALJ to hold a supplemental hearing; 6) a request is made to cross-examine the author or provider of post-hearing evidence. This section of *HALLEX* further notes that "the ALJ should continue a hearing only if there is good reason to do so." *HALLEX I-2-6-80.*

Indeed, Philpot's counsel went into great depth, asking Ms. Lee several hypothetical questions. (Tr. 68-74.)  The transcript reflects over 7 pages of questioning between Ms. Lee and Philpot's counsel.  (*Id*.)  Philpot's counsel made several adjustments to his hypothetical questions, and asked Ms. Lee details regarding the requirements of sedentary work.  (Tr. 68 -71.)  Although Ms. Lee did not provide the responses Philpot wanted, this does not, in and of itself, demonstrate Philpot was deprived of a "full and fair" hearing.[7]

Philpot nonetheless asserts, pursuant to *HALLEX I-2-5-58*, she is entitled to a supplemental hearing to further question Mr. Nimberger regarding his interrogatory responses. (Doc. No. 14 at 9, 10.)  This section of *HALLEX* is not applicable here, as there were no vocational interrogatories associated with the second decision.  While the ALJ failed to follow to the prescribed procedure under *HALLEX I-2-5-58* with respect to the first decision, the Appeals Council corrected that error, and remanded and vacated the first decision.  (Tr. 120.)  As the Commissioner correctly notes, the final decision of the Commissioner for purposes of the instance case is the second ALJ decision, issued after the Appeals Council remand.  This Court has no authority to review the first ALJ decision and any of its alleged deficiencies, as it has been vacated by the Appeals Council.  *See Rogers v. Comm'r of Soc. Sec.,* 2000 WL 799332 at *6 (6th Cir. 2000)(finding an ALJ order to be not a final judgement, as it was vacated by the Appeals Council)[8].

---

[7]     In addition, Philpot has not demonstrated she is not entitled to a supplemental hearing under *HALLEX I-2-6-80.*   She has not shown any of the circumstances contemplated under *HALLEX I-2-6-80*.

[8]     The Appeals Council declined to remand the matter a second time, thus, it appears the Council considered the ALJ decision to be in compliance with their remand order.  *See Coleman v. Berryhill*, 2017 WL 1208760 at *17 (N.D. Ohio Feb. 17,

For similar reasons, the Court further finds the ALJ was under no obligation to provide Philpot with the vocational expert of her choice. The ALJ informed Philpot he would be issuing a "new and independent decision" following the remand from the Appeals Council. (Tr. 52.) Further, at the second hearing, Philpot failed to object to Ms. Lee's qualifications to testify as a vocational expert. (Tr. 63.) She did note the discrepancy between Ms. Lee's testimony and Mr. Nimberger's interrogatory responses, but did not request that Mr. Nimberger be called to testify at that time. (Tr. 72.) At the end of the hearing, counsel noted he had no further questions for Ms. Lee. (Tr. 74.) Philpot's counsel did not ask for a supplemental hearing until five days later. (Tr. 300.) Philpot was provided with an ample opportunity to question the vocational expert Ms. Lee at the second hearing, which was in compliance with *HALLEX I-2-6-74.* Moreover, *HALLEX* does not require the ALJ to provide another hearing to Philpot, because she failed to raise the arguments or issues while at the hearing provided to her. [9]

It should be noted courts have "concluded that failure to follow exact procedures set forth in *HALLEX* does not require reversal absent a convincing showing of prejudice to the plaintiff." *St. Clair v. Astrue,* 2010 WL 3370568 at *7 (N.D. Ohio Aug. 10, 2010). Therefore, assuming *arguendo* there was a *HALLEX* violation, Philpot must make a showing of prejudice to establish a violation of due process.

Philpot does argue the ALJ's failure to provide a supplemental hearing was a prejudicial error, and a violation of due process. (Doc. No. 10 at 10.) However, as discussed above, VE

---

2017.)

[9]     Nor does Philpot cite any legal authority supporting the proposition that, under the regulations, the ALJ is required to specifically recall Mr. Nimberger to testify at a post-remand hearing.

Nimberger's interrogatory responses were associated with the prior, vacated ALJ decision. The Appeals Council remanded the first ALJ decision. (Tr. 120.) Philpot then had a new hearing with a new vocational expert, Ms. Lee. (Tr. 52.) At this second hearing, Philpot had the opportunity to cross examine Ms. Lee and ask her detailed hypotheticals. (Tr. 67-72.) Philpot cites no case law in support of her argument that the ALJ's failure to allow her to question a vocational expert associated with a prior, vacated ALJ decision violated due process. Her argument lacks merit and support. The ALJ decision was in line with the protections afforded by *HALLEX* and due process. The Court does not find reversible error.

Accordingly, for the reasons set forth above, the assignment of error is without merit.

**B.        Second Assignment of Error: RFC/Medical Source Opinions**

In her second assignment of error, Philpot argues the ALJ's residual functional capacity is not based upon substantial evidence and is contrary to law. (Doc. No. 14 at 4.) She maintains the ALJ failed to properly evaluate the findings and opinions of Dr. Sioson, a consultative examiner, and Ms. Kanarsky, an occupational therapist. (*Id*. at 10, 11.) She further notes the ALJ did not adopt the findings of the state agency physicians. (*Id*.)

The Commissioner maintains the residual functional capacity is well-supported. (Doc. No. 15 at 11.) She argues the ALJ properly considered the opinions of Dr. Sioson and Ms. Kanarsky. (*Id*. at 14.) Finally, the Commissioner asserts the residual functional capacity fully accounts for Philpot's asthma and limited treatment course. (*Id*. at 15.)

The residual functional capacity determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. §416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved for the Commissioner. *See* 20 C.F.R.

§416.927(d)(2). An ALJ "will not give any special significance to the source of the opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. §416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.,* 2012 WL 1028105 at *7 (W.D. Mich. March 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.,* 680 F.2d 472 (6th Cir. 1982.); *Reynolds v. Comm'r of Soc. Sec.,* 424 Fed. App'x 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.,* 260 Fed. App'x. 801, 807 (6th Cir. 2008)).

### Consultative Examiner Dr. Sioson

Philpot first maintains the ALJ erred by not properly weighing the factors set forth in the regulations when weighing Dr. Sioson's opinion. (Doc. No. 14 at 11.) Philpot cites to 20 C.F.R. §404.1527(d)[10], arguing the "ALJ was required to consider the length of the treatment relationship and frequency of examination between patient and physician when determining how much weight be given to these physicians' opinion. Supportability, consistency, and specialization are also considered in weighing his opinion." (*Id.*) She argues remand is required because the ALJ never cited or weighed these factors in evaluating Dr. Sioson's opinion. (*Id.*)

The Commissioner argues Dr. Sioson's opinion was properly weighed and considered. (Doc. No. 15 at 14, 15.) She notes while the regulations direct an ALJ to consider several factors when weighing opinions, they do not require an "exhaustive factor-by-factor analysis." (*Id.* at

---

[10]     The Court notes 20 C.F.R. §404.1527(d) applies to Title II disability claims only. Since the current action is a Title XVI claim, the Court assumes Philpot is basing her argument upon the complementary Regulation for Title XVI actions filed prior to March 27, 2017, set forth at 20 C.F.R. §416.927(c).

15.)  The Commissioner argues the ALJ "properly focused on the factor most relevant in this case, namely the lack of consistency" between the opinions and the medical evidence.  (*Id.*) Citing to the medical evidence, she maintains the ALJ properly discounted Dr. Sioson's opinion on the premise it conflicted with treatment records showing normal or near-normal findings.

In formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings."  20 C.F.R. §416.913(a).  Nonetheless, they still must consider all of the medical opinions contained in the record "together with the rest of the relevant evidence."  20 C.F.R. §416.927(b), (c).  The ALJ is charged with considering "all of the following factors in deciding the weight we give to any medical opinion."  20 C.F.R. §416.927(c).  These factors include: 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency with the record, 5) specialization of the source, 6) other factors, such as understanding the disability programs and knowledge of the other information in the case record.  *See* 20 C.F.R. §416.927(c)(1)-(6).

However, the ALJ is not required to articulate specific findings as to each of these factors.  Indeed, neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by factor analysis."  *Francis v. Comm'r Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011).  If an RFC assessment *conflicts* with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  *Puckett v. Colvin,* 2014 WL 1584166, at *8 (N.D. Ohio April 21, 2014) (*citing* Social Security Ruling 96-8p, 1996 WL 374184, *7 (July 2, 1996)).  However, if the medical source is a consultative examiner, the ALJ is not required to give the same level of deference as accorded a treating source.  *Id*. at *9.  For a consultative examiner, the ALJ is "only

required to acknowledge that their opinions contradicted his RFC finding, and explain why he did not include their limitations in his determination" of the RFC. *Id.*

Here, the ALJ thoroughly recounted the medical evidence regarding Philpot's physical impairments. (Tr. 13-15.) The decision then went on to discuss the consultative examination at issue as follows:

> On June 25, 2014, the claimant was seen for a consultative physical examination in connection with her application of benefits. The claimant alleged disability due to asthma and joint pains. She stated that she last worked in 2009 due to medical problems. The claimant reported that she had not been hospitalized for asthma but goes to the emergency room about 7 times per year for asthma. She has cough, wheezing and shortness of breath several times a week, usually triggered by exertion and certain odors. She uses her albuterol inhaler about 4 times per week. On examination, the claimant had "somewhat diminished breath sounds," but no crackles, rhonchi or wheezing. The pulmonary function testing showed moderate obstructive ventilator impairment with significant response after bronchodilator. The examiner concluded that the claimant can sit for one hour at a time, stand/walk for 15 minutes at a time, sit for 4 hours total, and stand/walk for 1 hours total in an 8-hour workday. She can lift and carry up to 10 pounds frequently and 20 pounds occasionally. She can never kneel, crouch or crawl and only occasionally climb, balance and stoop. She can occasionally climb stairs, ramps, ladders, ropes, or scaffolds. He limited the claimant to sedentary exertional level activity (Exhibit 12F). The undersigned gives little weight to this opinion, as it is inconsistent and not supported in the record. It relies mainly on the claimant's subjective complaints.

(Tr. 14, 15.)

The Court finds the ALJ properly evaluated Dr. Sioson's opinion. The ALJ discussed the examination findings and expressly acknowledged Dr. Sioson's opinion. (Tr. 14, 15.) The ALJ ascribed "little weight" to this opinion, and provided two reasons for doing so. (Tr. 15.) Specifically, the ALJ noted it was not consistent with the record and relied on Philpot's subjective reports. (*Id.*) The ALJ discussed, at length, the subjective complaints Philpot voiced

to Dr. Sioson. (Tr. 14.) The ALJ also thoroughly discussed and reviewed all of Philpot's treatment notes prior to discussing Dr. Sioson's opinion. (Tr. 13-15.) Specifically, the ALJ discussed the lack of regular treatment for her knee complaints, as well as normal range of motion on examination. (Tr. 13.) The ALJ noted Philpot did not treat with a specialist or primary care doctor for her asthma. (Tr. 14.) He further noted that, often on examination, Philpot was not wheezing or in respiratory distress. (*Id.*) The ALJ concluded "despite no maintenance treatment for her asthma, the record also shows the claimant had not been hospitalized for asthma and had not required intubation." (*Id.*) The ALJ then carefully reviewed the pulmonary function testing during the consultative examination, noting moderate findings and a significant response to a bronchodilator. (Tr. 15.) After this careful review, the ALJ then provided two reasons for why he was affording Dr. Sioson's opinion "little weight." (*Id.*) Procedurally, the regulations require no more. Thus, the Court finds the ALJ sufficiently articulated his reasons for according "little weight" to Dr. Sioson's opinion, and, further, that those reasons are supported by substantial evidence.

Accordingly, the Court finds the ALJ did not err in rejecting Dr. Sioson's opinion.

### *Occupational therapist Kanarsky*

Philpot next argues the ALJ failed to properly consider Ms. Kanarsky's opinion and functional assessment. (Doc. No. 14 at 10.) As noted *supra,* Philpot presented to Ms. Kanarsky for a physical capacity evaluation on April 16, 2013. (Tr. 774-776.) Ms. Kanarsky then provided an opinion on Philpot's limitations. (*Id.*) Philpot argues the ALJ did not properly apply

Social Security Ruling 06-03p[11] when evaluating Ms. Kanarsky's opinion.  (*Id*. at 11, 12.)  She also argues Ms. Kanarsky's "examination, testing, recommendations and PCE are 'relevant' evidence that should have been considered in conjunction with the RFCs from Dr. Sioson and the state agency doctors" under 20 C.F.R. §404.1527(a)(2)(b).[12]  (*Id*. at 11.)

The Commissioner argues the ALJ properly considered Ms. Kanarsky's opinion.  (Doc. No. 15 at 14.)  She notes the ALJ found the assessment was inconsistent with the evidence and appeared to be based upon subjective complaints.  (*Id*.)  The Commissioner argues the ALJ "properly focused on the factor most relevant in this case, namely the lack of consistency between both opinions and the record as a whole."  (*Id*. at 15.)

Under Social Security Regulations, an occupational therapist is not an "acceptable medical source" entitled to the type of controlling weight an acceptable medical source enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).  However, the regulations provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c).  The regulations further provide that "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the

_____

[11]  The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

[12]  The Court again notes that 20 C.F.R. §404.1527(d) applies to Title II disability claims only.  Since the current action is a Title XVI claim, the Court assumes Philpot is basing her argument upon the complementary regulation for Title XVI actions filed prior to March 27, 2017, set forth at 20 C.F.R. §416.927(c).

determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03 further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as an occupational therapist) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

Here, the ALJ discussed Ms. Kanarsky's the functional capacity evaluation as follows:

> A physical therap[ist] conducted a functional capacity evaluation on April 16, 2013. The physical therap[ist] said the claimant was able to carry 17 pounds using just the left hand. Claimant would be a good candidate for part-time sedentary to light jobs with lifting and carrying 17 pounds occasionally and frequent lifting and carrying of up to 8.5 pounds (Exhibit 8F/30-32). This opinion has been considered, but it is not consistent with the medical evidence of record and is based in a large part on the claimant's subjective complaints. (Tr. 14.)

The Court finds the ALJ properly evaluated Ms. Kanarsky's opinion. The ALJ expressly acknowledged her opinion, but noted it was not consistent with the record and relied on the subjective reports of Philpot. (Tr. 14.) As noted *supra,* the ALJ recounted Philpot's

treatment record in the body of the decision, noting she had no regular treatment for either her asthma or knees, and did not treat with a specialist for either condition. (Tr. 13, 14.) The ALJ acknowledged Ms. Kanarsky was Philpot's therapist and she conducted a functional capacity evaluation. (*Id*.) He also noted the examiner was a physical therapist. (*Id*.) As noted above, the ALJ is charged with generally explaining the weight given to opinions from other sources, or "otherwise ensur[ing] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2). The ALJ's discussion of the opinion complies with this regulation, as well as the factors set forth in SSR 06-03p.

Philpot also argues the ALJ did not consider Ms. Kanarsky's functional capacity evaluation together with the other medical opinions contained in the record, pursuant to 20 C.F.R. §416.927(c). This argument is likewise without merit. The ALJ specifically discussed this opinion, along with all the other evidence in the record. (Tr. 14.) The ALJ noted he had "considered" this opinion, and compared it with the other evidence contained in the record. (*Id*.). This fulfills the ALJ's obligations under 20 C.F.R. §416.927(c)( "we will always consider the medical opinions in your case record together with the rest of the relevant medical evidence we receive.")

Accordingly, the Court finds the ALJ did not err in rejecting Ms. Kanarsky's opinion.

### *Rejection of all opinions in the record*

Finally, Philpot posits the ALJ substituted "his opinion for medical professionals" when he did not follow the opinions of any acceptable medical source. (Doc. No. 14 at 13.) She argues the ALJ "cannot speculate as to the seriousness of a claimant's medical condition." (*Id*).

She notes the ALJ did not follow any of the opinions contained in the record, and the "ALJ, who is not a physician, cannot make this medical determination." (*Id*. at 14).

The Commissioner argues the ALJ fully accounted for Philpot's asthma in his residual functional capacity assessment. (Doc. No. 15 at 15.) The Commissioner notes Philpot's "limited course of treatment and examiners' uniformly normal or near-normal findings provide strong support for the ALJ's RFC." (*Id*.)

Under the Social Security Regulations, as discussed *supra*, an ALJ must consider each opinion contained in the record. 20 C.F.R. §416.927(c). However, the regulations do not provide that an ALJ must subscribe to at least one of the opinions contained in the record. The regulations provide "although we consider opinions from medical sources on issues such as. . . .your residual functional capacity. . . the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. §416.927(d)(2). (While an ALJ is required to consider and weigh all medical opinions, the RFC determination is ultimately reserved for the Commissioner. *Lehr v. Comm'r of Soc. Sec.,* 2017 WL 3840419 at *9 (N.D. Ohio Sept. 1, 2017) (citing *Ford v. Comm'r of Soc. Sec.,* 114 Fed. Appx. 194, 198 (6th Cir. 2004)).

The ALJ discussed and considered the three opinions contained in the record. (Tr. 14, 15.) Specifically, he considered the opinions of occupational therapist Kanarsky, consultative examiner Sioson, and the state agency physicians. (*Id*.) He did not adopt Ms. Kanarsky's opinion, assigned "little weight" to the opinion of Dr. Sioson and only "some weight" to the opinions of the state agency physicians. (*Id.*) As noted *supra,* the ALJ provided sufficient reasons for the weighing of each of these opinions. (*Id.*) He also provided a comprehensive review of the medical evidence contained in the record, noting the minimal treatment course, the

noncompliance, and the normal findings upon examination, thus, supporting his residual functional capacity assessment.  (Tr. 13-15.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly assessed the opinion evidence in the record.  Philpot's argument the RFC is not supported by substantial evidence is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 7, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**